IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JANE Y.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 23 C 1814 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| MARTIN J. O'MALLEY, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

"[T]he 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard."
*Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021)

Plaintiff filed her application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381a, 1382c, over four and a half years ago in May of 2019. (Administrative Record (R.) 172-77). She claimed that she had been disabled since November 15, 2016 (R. 196) due to PTSD, bipolar, depression, diabetes, kidney failure, and heart failure. (R. 196). Plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. She filed suit in federal district court under 42 U.S.C. § 405(g) on March 23, 2023. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on April 6, 2023, and the case was reassigned to me on July 5, 2023. [Dkt. ##6, 8]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

I.

Born September 4, 1981, the plaintiff was just 35 years old when she claimed she could no longer work. (R. 172). Prior to that, she hadn't work much at all, just 4 full years in the span from 1998 to 2022. (R. 188-89). After an administrative hearing at which plaintiff and a vocational expert testified[2], the ALJ determined that the plaintiff had performed substantial gainful activity in 2021 – since her application – but also found that there was a twelve-month period since her alleged onset date in which she was not engaged in substantial gainful activity. (R. 17). The ALJ then found that the plaintiff had the following severe impairments: major depressive disorder, panic disorder, post-traumatic stress disorder, polysubstance use disorders (R. 17). The ALJ determined that plaintiff's other impairments – obesity, diabetes mellitus, hypertension and, reportedly, chronic kidney disease – were controlled with conservative treatment and were not severe impairments. (R. 18). Additionally, while the plaintiff complained of physical limitations due to back pain and neuropathy, the ALJ noted that the record did not document ongoing complaints or examination findings of pain, loss of sensation, or significant limitation in the use of the affected extremities. (R. 18). The ALJ also noted that, while the plaintiff complained of hip pain prior to the application date, imaging showed no abnormalities. (R. 18). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P,

---

[2] The plaintiff appeared at the hearing without counsel. When the ALJ asked whether she had read the notice explaining her right to have an attorney represent her, the plaintiff said she had not. (R. 39). That notice explained the manner in which an attorney could aid in the proceedings, the possibility of free counsel or a contingency arrangement, and the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees. (R. 141-42). *See Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). At the hearing, the ALJ explained what an attorney could do for her and that the attorney could not receive a fee unless the Social Security Administration approved of the fee. (R. 39-40). The plaintiff said she wanted to proceed without counsel. (R. 40).

Appendix 1. (R. 18). As for the plaintiff's mental impairments, the ALJ determined that the plaintiff had mild limitations in the areas of understanding, remembering or applying information and adapting or managing oneself. The plaintiff had moderate limitations in the areas of interacting with others and concentrating, persisting or maintaining pace. (R. 18).

The ALJ then found that the plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can concentrate on simple tasks where she is not required to interact with the general public. (R. 20). The ALJ next summarized the plaintiff's allegations. He noted that the plaintiff claimed she has been unable to work since 2016 due to problems focusing and remembering and "a lot of pain." The plaintiff also said her medications "don't allow [her] to function properly." She reported that she needs "some" help bathing and "sometimes" needs "help in the bathroom," but can prepare simple meals, perform household chores, and shop in stores. The ALJ noted that the plaintiff's mother reported that the plaintiff can perform a similar range of daily activities, follows written instructions well, and got along with others "pretty good as long as she take[s] her med[ication]." The ALJ further noted that later, both the plaintiff and her mother reported much greater limitations in daily activities, claiming plaintiff did not prepare meals, perform any household chores, or shop and that she can "hardly walk" and uses a walker.

The ALJ added that the plaintiff testified that she has been treated with medication and therapy since May 2020, that she had suicidal ideation in the month prior to her hearing, and that her addiction to marijuana and cocaine interfered with her ability to function. But, the plaintiff also reported that she had been sober since she went to rehabilitation in November 2020. Plaintiff said she had fallen thirty-three times and used a walker due to back, hip, and knee pain. She testified that

3

she did "damage to her body" in a suicide attempt, which causes her to "black out." The ALJ also noted that, contrary to plaintiff's second function report, but consistent with her first, she testified that she does household chores, goes out to eat, and attends church. (R. 20). The ALJ then concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms cannot reasonably be accepted as consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. (R. 21).

The ALJ then went over the medical evidence. He noted that plaintiff had been treated for mental impairments, characterized as depression, anxiety, bipolar, and post-traumatic stress disorders, since long before the period at issue. In May 2018, she sustained injuries from a fall and was tearful as she had lost custody of her children, had no money and was not taking her psychotropic medication. The plaintiff was counseled on local shelters and obtaining medications through the county health department. In December 2018, the plaintiff was again noncompliant with prescribed medication and admitted to inpatient care after threatening suicide in a police car. Psychiatric examination noted that plaintiff was calm, cooperative, and "in contact with reality"; she had no memory loss, organized and goal-oriented thinking, fair judgment and insight. (R. 21).

The ALJ went on to note that, around the application date, the plaintiff was kicked out of a rehabilitation facility for fighting. She was evaluated for alcohol withdrawals and admitted to drinking three to four pints of vodka daily for thirteen years and to a history of cocaine use. (R. 22). In April 2019 visit, the plaintiff was using a walker due to complaints of hip pain that she attributed to a fall two months prior, but physical and mental examinations were unremarkable, and imaging showed no abnormalities to support her hip complaints or the need for any assistive device. (R. 22).

The ALJ then reported that, at plaintiff's August 2019 consultative psychological examination, she said that her chief complaint was fainting spells, which she attributed to a past suicide attempt, but which no medical source has associated with any medically determinable impairment. (R. 22). During her mental status exam, plaintiff was "unable" to complete a serial subtraction exercise, recall words after a delay, or name a recent event. In another consultative examination in October 2019, the examiner noted there were no significant physical limitations, and that she related well, appeared in no distress, and had appropriate mood, memory, cognitive, and intellectual functioning. (R. 22).

Thereafter, in late October 2019, lab results showed that plaintiff continued to use alcohol, THC, and cocaine. Yet, psychiatric examinations remained stable. (R. 22). She said she made multiple suicide attempts during substance abuse. She displayed adequate functioning, although she reported an increase in neuropathic pain when she was off of gabapentin; her doctor advised her to exercise for forty-five to sixty minutes daily. In December 2019, the plaintiff complained of neuropathic pain. An EMG revealed axonal length dependent polyneurpathy and mild right median mononeuropathy at the wrist. Gait, motor strength, and mental status exams were unremarkable. (R. 23).

The ALJ related that plaintiff said she began working as a custodian in January 2020 and continued to do so at the time of her hearing in April 2022. Through 2020, the plaintiff indicated she was having trouble with availability of diabetes medications and supplies, examinations remained essentially normal, though she was using a walker at one visit and reported intermittent crying spells. (R. 23). The plaintiff completed rehabilitation in November 2020 and had then been sober for an extended period. She has also been stable on her medications, and mental status exams

5

were generally unremarkable and mental status examinations generally remained stable. She did have some setbacks: she had to leave her house in April 2021, reports to her provider indicated she stopped working for fear she would not qualify for disability benefits, and her boyfriend kicked her out in March 2022 and she relapsed on alcohol and drugs. (R. 23-24). On the other hand, in April 2021, she reported she was "doing good" and her mood was "getting a whole lot better." She reported she was in a "good" and "happy" mood in August 2021, and in January 2022 she said she was learning Spanish for a trip to Mexico. (R. 24). Around that time she said her mood was up and down. (R. 23).

The ALJ then considered the medical opinions in the record. The ALJ noted that the state agency psychiatric consultants felt the plaintiff had severe mental impairments and substance use disorders, but remained capable of performing one- and two-step tasks that did not require interaction with the general public. The ALJ found that assessment to be generally consistent with the longitudinal record and persuasive, but said that given that plaintiff's work activity in 2021 indicated she was capable of simple jobs with more than one- or two-step tasks, he did not adopt those opinions verbatim. (R. 24-25). The ALJ then noted that the initial medical reviewing consultant initially opined that the plaintiff was limited to medium exertion work due to her physical impairments, but the reconsideration consultant opined that she had no severe physical impairment. The ALJ found the reconsideration opinion more persuasive, given the plaintiff's minimal treatment for physical impairments and generally unremarkable examination. The ALJ said that the plaintiff's use of a walker is not established to be medically necessary, and the record supported no significant limitations persisting for a continuous twelve-month period. The ALJ added that the consultative examiner also felt that the plaintiff had no significant limitations in performing basic work activities

6

because of any physical impairment. The ALJ found that opinion to be persuasive as it was supported by the consulting examiner's examination notes and consistent with the longitudinal record. (R. 25).

The ALJ next related that the vocational expert testified that plaintiff's past work was a light-exertion composite job involving aspects of the jobs cleaner, housekeeping and file clerk, given her duties of simple filing tasks and cleaning responsibilities. The vocational expert classified the cleaner job under Dictionary of Occupational Titles code #323.687-014, and explained that the plaintiff's duties were simple (SVP 2) and that the job required light exertion. The ALJ then relied on the testimony of the vocational expert that a hypothetical individual with the claimant's age, education, work experience, and residual functional capacity could perform the plaintiff's past relevant work as a cleaner the plaintiff actually performed the job. (R. 25). Accordingly, the ALJ found the plaintiff not disabled under and not entitled to benefits under the Act. (R. 26).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales,* 402 U.S. 389, 401 (1971); *see also Baptist v. Kijakazi*, 74 F.4that 441. To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support

8

the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. But, the Seventh Circuit has also called this requirement "lax." *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's

reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3]

The ALJ did enough here.

## III.

The plaintiff has two issues with the ALJ's decision which she argues necessitate a remand. First, the plaintiff complains that the ALJ failed to explain why the moderate limitations in interacting with coworkers and peers, which were included in both reviewing psychologists' opinions, were not incorporated into the RFC finding. And, second, the plaintiff takes the ALJ to

---

[3] Prior to Sarchet's "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
>
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted).

Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

10

task for finding her neuropathy was non-severe, failing to determine whether her syncope was a severe impairment, and then failing to include limitations for either impairment in the RFC finding. Any other arguments the plaintiff might have raised are deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022)("Arguments not raised in the district court are waived."); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020)(". . . arguments omitted before the district court are [waived].").

### A.

Plaintiff's first argument focuses on the opinions that the state agency reviewing psychologist expressed after review of the medical record at the initial and reconsideration levels of the administrative process. These reviewers are, under the regulations, considered to be "highly qualified and experts in Social Security disability evaluation." *Grotts*, 27 F.4th at 1278; *see also Anders v. Saul*, 860 F. App'x 428, 433 (7th Cir. 2021)(". . . it was appropriate for the ALJ to look favorably on [the reviewing doctor's] opinions on the basis that they are "highly qualified and experts in Social Security disability evaluation."). When consistent with the medical record, their opinions constitute "substantial evidence" to support an ALJ's opinion. *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022).

At the initial level of consideration in August 2019, psychologist Howard Tin found the plaintiff moderately limited in ability to get along with coworkers or peers without distracting them or exhibiting extreme behaviors and in the ability to interact with the general public; and not significantly limited in ability to accept instructions and respond appropriately to criticism from supervisors or in the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. 80). As the form requires, Dr. Tin went on to "[e]xplain in narrative

11

form the social interaction capacities and/or limitations." Dr. Tin noted that plaintiff had difficulty carrying out detailed instructions and maintaining concentration for extended periods, but could perform simple tasks. She had difficulty interacting with the general public and would require a work limitation as such. Along with that work limitation, he concluded that the plaintiff was capable of performing one and two-step tasks. (R. 81).

At the reconsideration level in October 2020, psychologist M. W. DiFonso echoed the initial findings: moderately limited in the ability to interact appropriately with the general public and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; not significantly limited in the ability to accept instructions and respond appropriately to criticism from supervisors other in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 100). Dr. DiFonso's narrative explanation was also essentially the same: that the plaintiff had difficulty in interacting appropriately with the general public and should be limited to work that did not require interaction with the general public; that the plaintiff had the ability to respond appropriately to changes in work settings, being aware of normal hazards and travel in unfamiliar settings; and that the plaintiff was capable of performing one and two-step tasks. (R. 101).

As already noted, the ALJ reviewed the two psychologist's findings that the plaintiff was capable of performing one- and two-step tasks that do not require interaction with the general public, and found them "generally consistent with the longitudinal record and is persuasive in light of the record." But, the ALJ felt that the plaintiff's ability to perform substantial gainful activity in 2021 – the year after the two psychologist's reviews of the record – demonstrated that the plaintiff would be capable of simple jobs with more than one- or two-step tasks. (R. 24-25).

The plaintiff faults the ALJ for failing to adopt Dr. Tin's and Dr. DiFonso's notations that the plaintiff was moderately limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. [Dkt. #10-1, at 11]. But, while the two psychologists did answer that plaintiff was moderately limited in that area in the question or "worksheet" part of the forms, neither made such a limitation a part of their final narrative residual functional capacity findings. As the form indicates, "[t]he questions below help determine the individual's ability to perform sustained work activities. However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion." (R. 79, 98). So, the two psychologists distilled all of their "question"or "worksheet" limitations into their final narrative residual functional capacity findings.

The "worksheet-narrative" distinction is one of those somewhat murky areas that we find in our bureaucracies. But, apparently, there's a purpose to it and it's explained in agency's Program Operations Manual System ("POMS"):

> The purpose of section I ... is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation.... It is the narrative written by the psychiatrist or psychologist in section III ... that adjudicators are to use as the assessment of RFC.

*Capman v. Colvin*, 617 F. App'x 575, 578–79 (7th Cir. 2015)(quoting POMS DI 25020.010(B)(1), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010).[4] So, it would seem that, the worksheet is where the reviewers think about what limitations arise from the plaintiff's impairments

---

[4] The Commissioner, thoughtfully and painstakingly, explains all this in her brief. [Dkt. #12, at 4-6]. And, perhaps tellingly, once provided with an explanation of how this part of the system is designed to work, the plaintiff does not address the matter in her reply brief. [Dkt. #13]. *Compare Berlinda G. v. Kijakazi*, No. 22 C 4196, 2023 WL 3847107, at *3 (N.D. Ill. June 6, 2023)("Tellingly, despite having the opportunity to do so, Plaintiff did not file a reply brief and did not challenge Defendant's assertions in that regard.")

13

and the narrative is where they determine and explain whether and how those limitations affect the plaintiff's ability to work. And, it would also seem that ALJs are to skip all that and go straight to the main course. That's what the ALJ did here, so he was simply following the rules.

But, the Seventh Circuit does not allow ALJs to simply ignore the worksheet and focus on the narrative; well, not always, anyway. In *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015), the Seventh Circuit said that worksheet observations are "less useful to an ALJ than a doctor's narrative RFC assessment" but categorized them as "medical evidence which cannot just be ignored." 794 F.3d at 816. But, at the same time, the court allowed for situations where "an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations." 794 F.3d at 816. As an example, the *Varga* court pointed to *Johansen v. Barnhart*, 314 F.3d 289 (7th Cir. 2002). There, the Seventh Circuit allowed the ALJ to skip the worksheet notations of moderate limitations in maintain schedule and attendance and completing a normal workday and rely on the reviewer's narrative finding that, nevertheless, the plaintiff could still perform low-stress, repetitive work. 314 F.3d at 289.[5]

---

[5] Other Circuits have streamlined the whole worksheet-narrative issue. Among them, the Tenth Circuit has perhaps done so most succinctly by saying that challenges to whether an ALJ's assessment of residual functional capacity incorporate limitations in the worksheet ask "the wrong question. . . . We compare the administrative law judge's findings to [the reviewer's] opinion on residual functional capacity, not [worksheet] notations of moderate limitations." *Smith v. Colvin*, 821 F.3d 1264, 1269 n.2 (10th Cir. 2016); *see also Garner v. Colvin*, 626 F. App'x 699, 703 (9th Cir. 2015)(". . . the ALJ did not err by failing to incorporate certain limitations into the hypothetical questions posed to the VE. The ALJ properly followed the Commissioner's Program Operations Manual System, which directs adjudicators to use the narrative in Section III (Functional Capacity Assessment) . . . to ascertain a claimant's RFC, rather than the check-boxes in Section I (Summary Conclusion). . . . . The ALJ did not need to specifically identify each "moderate" limitation noted in Section I for the VE because these had already been incorporated into the workplace limitations narrative of Section III."); *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 563 (6th Cir. 2014)("It is apparent that the ALJ, in relying solely on the [narrative] III analysis, was not acting arbitrarily or merely cherry picking from the record, as [plaintiff] contends, but was properly applying the doctors' actual findings. We therefore conclude that the ALJ did not err in creating a hypothetical that solely referenced the [narrative] assessment."); *Land v. Comm'r of Soc. Sec.*, 494 F. App'x 47, 49 (11th Cir. 2012)(rejecting
(continued...)

14

The problem in *Varga* was the fact that there *was no* narrative for the ALJ to rely on, so the ALJ had to account for the limitations in the worksheet section. *Varga*, 794 F.3d at 816. But, that's not a problem here and the narrative sections from Drs. Tin and DiFonso "adequately encapsulate the checklist." *Varga,* 794 F.3d at 816. As the Seventh Circuit has more recently explained "[a] 'moderate limitation' is defined by regulation to mean that functioning in that area is 'fair.'" *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021). And, as the Commissioner pointed out in her brief – and in the brief in *Pavlicek* as well – "fair" in ordinary usage does not mean "bad" or "inadequate." 994 F.3d at 783; [Dkt. #12, at 4-5]. As such, it makes sense that the reviewing psychologists did not include a specific limitation regarding plaintiff's ability to get along with co-workers in their narratives because the plaintiff's ability in that area was "fair." And, it follows, that the ALJ was entitled to rely on those narratives because they "adequately encapsulated the checklist."

**B.**

Next, the plaintiff argues that the ALJ erred by finding that her neuropathy was non-severe, by failing to determine whether plaintiff's syncope was a severe impairment, and then failing to include limitations for either impairment in the RFC finding. First, as to plaintiff's neuropathy, the

---

[5](...continued)
argument that ALJ failed to include moderate limitations from worksheet in the RFC and explaining that the "Social Security Administration's Programs Operations Manual System (POMS) clarifies that the boxes checked by [the reviewing physicians] are only part of a worksheet that "does not constitute the [doctors' actual] RFC assessment." . . . Checking the box "Moderately Limited" means only that the claimant's capacity is impaired; it does not indicate the degree and extent of the limitation. . . . After checking the boxes as an "aid," . . . a doctor is then required to detail his actual RFC assessment."); *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 636 (3d Cir. 2010)(rejecting argument that ALJ's hypothetical did not include reviewing doctor's conclusions that plaintiff was moderately limited in various areas noted in the Section I worksheet and explaining that "Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment.").

ALJ found it was not a severe impairment. In so doing, that ALJ explained that "[n]europathy has been established as a medically determinable impairment, but the record does not document ongoing complaints or examination findings of pain, loss of sensation, or significant limitation in the use of the affected extremities." (R.18). The plaintiff calls this "an improper mischaracterization of the evidence of record" and says it "ignores evidence to the contrary." [Dkt. #10-1, at 13].

But, the ALJ didn't ignore evidence of neuropathy, he noted a handful of findings. (R. 23). The problem is there were no findings of limitations. Neuropathy is a diagnosis, and a diagnosis is not a disability. *Fair v. Saul*, 853 F. App'x 17, 21 (7th Cir. 2021); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). Neuropathy is not necessarily disabling, even when combined with other impairments. *See, e.g., Diaz v. Kijakazi*, No. 22-2904, 2023 WL 5275905, at *4 (7th Cir. Aug. 16, 2023); *Durham v. Kijakazi*, 53 F.4th 1089, 1092 (7th Cir. 2022); *Deborah M. v. Saul*, 994 F.3d 785, 787 (7th Cir. 2021). What matters is the severity of the condition and how it limits plaintiff's capacity to work as based on clinical and/or laboratory findings. *See Elder*, 529 F.3d at 415 ("... it makes no difference if [plaintiff] saw [his doctor] "every two-and-a-half months" ... what does matter is that [his doctor] did not confirm the severity of [plaintiff's impairment] with medical examinations or tests."); *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("The issue in the case is not the existence of these various conditions of hers but their severity...."). The problem here is that plaintiff does not direct the court to any medical evidence establishing limitations due to her neuropathy. If the plaintiff thinks the ALJ ought to have found limitations in addition to those he made a part of his RFC, the plaintiff has the burden of establishing them with medical evidence. *Gedatus*, 994 F.3d at 905; *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019); *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018)("It was [plaintiff's] burden to establish

16

not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work.").

The plaintiff contends that she "complained of neuropathy pain throughout the relevant period." [Dkt. #10-1, at 13]. First of all, complaints alone do not establish limitations. Indeed, as in all contexts, merely saying so doesn't make it so. *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir. 2010).[6] The plaintiff has to provide medical evidence to show the severity of her impairment. 20 C.F.R. § 416.912(c); *Karr*, 989 F.3d at 513 (plaintiff must "identify[ ] ... objective evidence in the record" that she is disabled). " . . . [S]ubjective complaints are the opposite of objective medical evidence . . . ." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see also Zoch*, 981 F.3d at 601 ("A claimant's assertions of pain, taken alone, are not conclusive of a disability."); 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ."). And, second of all, "throughout the relevant period" is a bit of an exaggeration. The plaintiff points to two complaints from one week in August 2019, and one in December 2019. [Dkt. #10-1, at 13]. The plaintiff filed her application

---

[6] *See also Illinois Republican Party v. Pritzker*, 973 F.3d 760, 770 (7th Cir. 2020)("Notably absent from these allegations, however, is any proposed proof that state actors, not municipal actors, were engaged in this *de facto* discrimination."); *Donald J. Trump for President, Inc. v. Secy of Pennsylvania*, 830 F. Appx 377, 381 (3d Cir. 2020)("But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here."); *Guerrero v. BNSF Ry. Co.*, 929 F.3d 926, 929 (7th Cir. 2019)("[S]aying so doesn't make it so.")*; Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 473 (7th Cir. 2018); *Stromberg Motor Devices Co. v. Zenith Carburetor Co.*, 254 F. 68, 69 (7th Cir. 1918). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, _U.S._, 138 S.Ct. 767, 779 (2018); *Bowers v. Dart*, 1 F.4th 513, 520 (7th Cir. 2021)("With all of this evidence in mind, we share the district court's conclusion that a rational juror could doubt that Bowers was telling the truth by insisting he could not walk."); *Planned Parenthood of Indiana and Kentucky v. Box*, 949 F.3d 997, 998 (7th Cir. 2019)("Talk is cheap."). At bottom, this basic principle of law and life underlies the rule that an attorney's unsupported assertion in a motion or brief is nott evidence and is not binding. *See INS v. Phinpathya*, 464 U.S. 183, 188 n. 6, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984); *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015); *Malik v. Holder*, 546 F. App'x 590, 593 (7th Cir. 2013); *Gross v. Knight*, 560 F.3d 668, 672 (7th Cir.2009).

in May 2019 and the ALJ issued his decision in July 2022. Three or four complaints over the course of more than three years is not "throughout." While a bit of exaggeration in the sake of zealous advocacy is understandable, it's probably not as good a tactic when you're accusing the ALJ of mischaracterizing the record.

Much the same goes for plaintiff's syncope. She was treated for syncope on one occasion, in February 2019, and the ALJ noted that in his decision. (R. 22). At that time, the plaintiff had been incarcerated and her medications were discontinued. Her blood sugars were elevated, electrolytes were abnormal, and she was severely dehydrated. (T. 413). She was treated with IV fluids and antibiotics, and her levels were improving (R. 416), but she left against medical advice before treatment was concluded because she wanted to smoke in her room. (R. 417-18). She then returned to complete treatment and was released. (R. 456). Plaintiff's syncopal episode – or perhaps episodes – is not so much an impairment as a possible symptom of one of the plaintiff's determined severe impairments.

The consultative examining physician thought plaintiff's claimed black-out spells could be related to multiple medications, orthostatic hypotension, or diabetic neuropathy. (R. 680). As with neuropathy, the ALJ did not ignore plaintiff's syncopal episodes, but with only one event noted in the medical evidence, and no limitations suggested by physicians, the ALJ properly did not include any limitations in his RFC. *See Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022)(ALJ must include "all of a claimant's limitations supported by the medical record."); *Jozefyk*, 923 F.3d at 497–98(ALJ commits no error when he "consider[s] all limitations supported by record evidence."); *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir.2007)(". . .the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.").

Finally, it is worth noting that – as the Commissioner points out [Dkt. #12, at 10-11] and plaintiff does not dispute [Dkt. #13] – no doctor provided an opinion that plaintiff's neuropathy or syncope resulted in any work limitations. Simply put, an ALJ does not commit an error when "there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); *see also Gedatus*, 994 F.3d at 904 ("A fundamental problem is [claimant] offered no opinion from any doctor to set [ ] limits ... greater than those the ALJ set."); *Recha v. Saul*, 843 F. App'x 1, 5 (7th Cir. 2021)("The difficulty for [plaintiff], however, is that an ALJ does not commit an error when 'there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.'").

## CONCLUSION

For the foregoing reasons, the plaintiff's "Motion for Judgment on the Pleadings" [Dkt. #10] is denied, and the Defendant's "Motion for Summary Judgment" [Dkt. #11] is granted.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/20/24